UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFMS LLC,<br><br>　　　　　　Plaintiff,<br>v.<br><br>UNITED PARCEL SERVICE CO. and<br>FEDEX CORPORATION,<br><br>　　　　　　Defendants. | Civil No. 12cv1503 JLS (NLS)<br><br>**ORDER GRANTING MOTION TO ENFORCE OUT OF DISTRICT SUBPOENA**<br><br>[Doc. No. 2] |

Plaintiff AFMS, LLC filed an antitrust action against defendants United Parcel Service Co. (UPS) and FedEx Corporation (FedEx) in the Central District of California. AFMS, a third-party consultant in the shipping industry that provides negotiating and other advice to UPS and FedEx customers, alleges that UPS and FedEx instituted policies that resulted in many or all third-party consultants experiencing resignations, forced lay-offs, profit losses or being driven out of business.

UPS served a subpoena on non-party Shipware LLC, asking for documents it believes are relevant to its defense. Shipware agreed to produce most of the documents requested. Outstanding, though, are customer lists and documents showing communications with Shipware's customers. UPS argues these documents are relevant because they go to whether the alleged conduct prevents third-party consultants from providing their services. Shipware refuses to produce the documents, arguing that the information sought is highly-protected trade secrets, and its disclosure would cause Shipware to lose significant goodwill and effectively go out of business. For the following reasons, the court **GRANTS** UPS's motion to enforce the subpoena.

## I. RELEVANT FACTS

### A. Third-Party Shipping Consultant Industry

Most shipping in the United States is conducted by UPS and FedEx. Martinez Decl. ¶ 3. In general, they offer two classes of rates for shipping services: published rates for infrequent customers, and discounted rates for high volume shippers under contract. *Id.* The level of discounts offered vary and are negotiated for each shipper. Martinez Decl. ¶ 4. Due to the variety and complexity of terms that can affect the pricing of the master contract between the shipper and the parcel carriers, a consulting industry has emerged since the 1990s that specializes in helping shippers understand and negotiate their parcel contracts. Martinez Decl. ¶¶ 6-7. These consultants include companies like AFMS and Shipware.

### B. The AFMS Litigation

AFMS alleges that since 2009 and to the present UPS and FedEx have conspired to refuse to deal with shippers that use third-party consultants. It alleges both companies instituted policies of seeking to negotiate contracts directly with shippers rather than through third-party consultants. AFMS complains that this conduct threatens the continued viability of third-party consultants and deprives them of the ability to compete in this market. AFMS attached to its third-amended complaint a purported UPS policy handbook that explains procedures to prevent UPS customers from using third-party consultants. UPS Ex. 1, pp.28-61. According to the handbook UPS considers third-party consultants as "direct competitors." UPS Ex. 1, p.44. UPS has an apparent policy of sending customers a 30-day cancellation notice if they use or are considering using a third-party consultant. UPS Ex. 1, p.48.

### C. Shipware's Business

Shipware was formed as a LLC in 2011. Martinez Decl. ¶ 8. It provides consulting and invoice auditing services to less than 20 volume shippers. *Id.* Its revenues for 2011 were approximately $270,000. *Id.* Shipware has expended a great amount of time, money and effort to identify potential customers that ship large volumes of packages and would benefit from its services. Martinez Decl. ¶ 10. Shipware considers the identity of its current and prospective customers its most valuable asset. Martinez Decl. ¶ 12. It also enters confidentiality agreements with these customers to protect their

identity. Martinez Decl. ¶ 13. Shipware asserts that if it must disclose its potential customer names to UPS, it must notify those potential customers of the disclosure, which, in turn, may forfeit the potential for doing business for those customers. Martinez Decl. ¶ 16.

### D. Subpoena to Shipware

In a statement to the press following the initiation of the AFMS litigation, Shipware's CEO, Rob Martinez, said that "Shipware is 'busier than ever' and that revenue has increased as the company writes more business." UPS Ex. 3, p.132. Martinez goes on to say that "Shipware's profits have been impacted because the formula it has traditionally relied on to divide the savings yielded from the negotiating process has changed." *Id.* Taking these statements, UPS says that Martinez has made various comments to the trade press showing he has a knowledge of the third-party consultant industry and the conduct at issue in the litigation. UPS Ex. 3, pp.132-133. Other discovery shows that Martinez has communicated with other third-party consultants about the alleged conduct and its impact. Beteta Decl. ¶ 7. In consideration of Martinez's statements, UPS served a subpoena on Shipware on March 23, 2012. UPS Ex. 3. The subpoena appears to seek documents related to these statements as well as to other issues in the litigation.

### E. Subpoenas to Other Third-Party Consultants

Between March 23 and 27, 2012, UPS served seven subpoenas on third-party consultants, including Shipware. Beteta Supp. Decl. ¶ 3. UPS says that five of the entities have produced communications with their customers and/or documents identifying their customers. Beteta Decl. ¶ 6; UPS Motion, p.5. But Shipware points out that UPS does not provide any information as to what, exactly, these third-party consultants produced. It also contends that UPS misleads the court by stating it subpoenaed only six other third-party consultants.

According to Shipware, UPS has issued subpoenas to at least 14 other "similarly situated" third-party consultants. Tobin Decl. ¶ 3; Grippa Decl. ¶ 4. At least one other third-party consultant is concerned about the nature of the UPS subpoena. *See* Winsett Decl. (CEO of third-party consultant NPI, LLC).

### F. The Protective Order

The Protective Order in the AFMS litigation provides that any party or non-party producing

documents may designate them as "Confidential" or "Highly Confidential - Attorneys' Eyes Only" ("AEO").  UPS Motion, Ex. 2.  AEO documents can only be disclosed to outside counsel, specifically named in-house counsel at UPS and FedEx, experts, the court and its staff, litigation support vendors, and the author or recipient of the document or the original source of the information.  The named in-house counsel must sign an "Agreement to be Bound by Protective Order" before reviewing AEO information.  Also, all materials produced under the Protective Order may only be used "for prosecuting, defending, or attempting to settle this litigation, and for no other purpose."  Motion, Ex. 2, p.99.

### G.   The Categories of Documents At Issue

Shipware agreed to produce many categories of documents, subject to objection.  Of the 15 categories of documents requested, these categories remain outstanding:

(1) Customer communications and customer lists responsive to requests 1 and 3;

(2) Any documents that identify Shipware's customers or prospective customers in response to requests 4, 8, 15 and 16 (Shipware has agreed to produce responsive documents but only with the identifying customer information redacted); and

(3) Any documents unless the Protective Order is modified so that documents that Shipware produces are only produced to outside counsel.

Shipware objects to production of these documents on the bases that the requests seek documents not likely to lead to the discovery of admissible evidence, improperly seek production of private and confidential financial information and information that is commercially sensitive, proprietary and trade secret, and are overly broad and unduly burdensome.  UPS Motion, Ex. 4, pp.140-141.

## II.   LEGAL STANDARD FOR MODIFYING SUBPOENA

Federal Rules of Civil Procedure 26 and 45 govern discovery from nonparties by subpoena.  *See Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 779 (9th Cir. 1994) (applying both rules to motion to quash subpoena).  Under Rule 45, on a timely motion, the issuing court *must* quash a subpoena that requires disclosure of privileged material not subject to waiver, or if it "subjects a person to undue burden."  Fed. R. Civ. Proc. 45(A)(iii)-(iv).  The issuing court *may* quash or modify a subpoena that requires "disclosing a trade secret or other confidential research, development, or other commercial information."  Fed. R. Civ. Proc. 45(B)(i).  First, the nonparty must show that the requested information

is protected as a trade secret or confidential commercial information. *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 684 (N.D. Cal. 2006) (citing Fed. R. Civ. Proc. 45(c)(3)(B).) It must support allegations of harm or prejudice with specific examples or articulated reasoning: "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotations and citations omitted). Then, "the burden shifts to the requesting party to show a 'substantial need for the testimony or material that cannot be otherwise met without the undue hardship[.]'" *Gonzales,* 234 F.R.D. at 684.

Although relevance under Rule 26 is not listed as a consideration in Rule 45, "courts have incorporated relevance as a factor when determining motions to quash a subpoena." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D.Cal. 2005) (citation omitted). Relevant information is that which is "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. Proc. 26(b)(1). In determining whether the information is relevant, the party seeking it must first tell the court its plans for the requested information. *Gonzales*, 234 F.R.D. at 680.

## III. DISCUSSION

### A. Confidentiality of Shipware's Customer Information

Trade secret or confidential business information includes "important proprietary information" or information that the nonparty has historically sought to maintain confidential. *Compaq Computer Corp. v. Packard Bell Elec., Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995).

Here, Shipware argues that its confidential customer identity information is its most valuable asset. Martinez Decl. ¶ 12. Shipware protects the identity of its current and prospective customers and stores their information on computers with restricted access. Martinez Decl. ¶ 13. It also enters confidentiality agreements with both current and prospective customers. *Id.* Prospective customers enter the confidentiality agreements because they send their shipping data to Shipware to receive a free evaluation. *Id.*

One of Shipware's concerns is that UPS says it would like to follow-up on any customers that were allegedly lost as a result of the carrier's third-party policies. UPS Motion, Ex. 8, p.169; Ex. 11, p.184. Due to UPS's alleged policy of discouraging its customers from using third-party consultants and cancelling contracts with those that use such consultants, Shipware wants to protect its current and

1  prospective customers from having punitive measures taken against them by UPS or FedEx, such as
2  increased shipping rates or cancellation of contracts.  Martinez Decl. ¶ 15.  Shipware relies on its
3  confidentiality agreements to alleviate the concerns of its current and prospective customers.
4        Based on the explanation of business practices by Mr. Martinez and assuming, for the sake of
5  this motion, the allegations in the third-amended complaint and statements in the accompanying exhibits
6  are true, the court is satisfied that Shipware has shown the information requested is trade secret or
7  confidential commercial information.  Now, the burden shifts to UPS to show its substantial need for the
8  material that cannot be otherwise met without undue hardship.
9        **B.    UPS's  Substantial Need for Shipware's Customer Information**
10        UPS is defending against antitrust claims.  According to UPS, to prove its case AFMS must
11  show that UPS refused to deal with third-party consultants so as to prevent shippers from using such
12  consultants.  It must also show that UPS's and FedEx's alleged conduct caused a "substantial adverse
13  effect on competition in the relevant market[.]"  *Betaseed, Inc. v. I Inc.,* 681 F.2d 1203, 1235 (9th Cir.
14  1982).
15        **1.    Shipware's communications with customers.**
16        UPS argues that Shipware's communications with its customers regarding UPS's or FedEx's
17  policies are relevant to defending against these claims because they will show whether the shippers have
18  foregone consulting services because of the alleged conduct, and whether Shipware has advised its
19  customers that it can provide services despite the alleged policies and customer reactions.  Shipware
20  argues that these reasons are not substantial justification because the fact that customers are Shipware
21  customers shows they have not given up on services by third-party consultants, and that should be
22  enough information to UPS to show lack of harm to the industry.
23        In the subpoena, UPS defines "Customer(s)" to include "former customers."  UPS Ex. 3, p.123.
24  UPS may find--in Shipware's communications--some customers who no longer use Shipware's services.
25  In follow-up discovery UPS can ascertain whether they no longer use Shipware because of the alleged
26  policies in place or for another reason, such as if the customers went to a Shipware competitor, or hired
27  an in-house negotiator.  The court finds that UPS has shown a substantial need for the customer
28  communications because they are relevant to the defense of whether its conduct caused a substantial

adverse effect on competition in the third-party consultant market.

**2.      Shipware's customer lists.**

UPS argues that it has a substantial need for the identities of Shipware's customers so that it can conduct further discovery to determine (1) whether the customer's decision was affected by the alleged conduct; (2) whether UPS chose to deal with Shipware with regard to a customer despite the alleged conduct; (3) how Shipware could provide services despite the alleged policies; (4) whether the customer chose a third-party consultant other than Shipware; (5) whether the customer chose to use its own resources to provide the services Shipware offers; and (6) whether Shipware customers obtained the same quality of services as before the alleged conduct.  UPS argues this information is relevant to its defense that there was no substantial adverse effect on competition in the relevant market.

Shipware counters that some of these purported justifications are nonsensical.  For example, UPS would have its own documents to show whether it dealt with Shipware.  Further, if a customer switched third-party consultants, that shipper's decision to do so does not relate to UPS's or FedEx's alleged policies of not dealing with third-party consultants.  Also, a customer's decision to use its own resources to negotiate may not necessarily have to do with the alleged policies of the defendants.  The court finds that as to these reasons, production of customer identities is justified because a switch of third-party consultants as opposed to a complete termination of consultant services would tend to show there is no substantial adverse effect on competition.  Or, a customer's decision to use an in-house negotiator who can achieve similar results as a consultant may be based on cost rather than on the alleged policies.

As to the remaining justifications, Shipware argues that its customers' identities are not necessary to obtain answers to the questions asked because Shipware has offered to produce a power point slide from its Introduction to Services Presentation, which addresses UPS's and FedEx's policies and what Shipware tells its prospective customers; articles, blog entries and webinars related to UPS's and FedEx's policies and third-party consultants; and exemplar contracts and customer proposals to show whether Shipware offers services similar to what AFMS offers.  Further, Shipware argues that UPS does not explain why the fact that Shipware is in business and has customers is not enough to demonstrate a lack of adverse effects on competition in the market, or how the identity of Shipware's

customers could add any more information to the lack of adverse effects. Along with the financial information, business information, sales and promotional literature and pricing tools of Shipware as well as the pricing tools used by other third-party consultants that Shipware will produce, UPS has enough information to help its defense of whether there was a substantial adverse effect on competition in this market.

The court finds that the proposed follow-up discovery to the customers is not cumulative to what Shipware will produce. For example, Shipware's financial information will show whether its profits have increased or decreased over the time of its existence. If it has decreased, UPS can find out whether it has decreased due to the alleged policies or if it decreased because of Shipware's performance. If profits are on an incline, UPS can find out if Shipware is picking up customers from other third-party consultants or if current customers are increasing their volume. This information is not cumulative to what Shipware will produce.

### 3. Undue hardship.

UPS argues that Shipware's customer information can only be obtained from Shipware, so it cannot otherwise obtain this discovery without undue hardship, if at all. Shipware counters that UPS served subpoenas on at least six other third-party consultants and that five produced their customer information. Therefore, it argues that UPS already has the identities of several customers it can contact. Further, Shipware's total revenue for 2011 was $270,000. This is far less than the amount of profits AFMS allegedly lost–$15 to $20 million–or the profits that another third-party consultant, Insource Spend Management Group, allegedly lost, valued at $21 million.

The court finds that UPS cannot otherwise obtain the information without undue hardship, if at all. The fact that UPS has obtained customer lists from other consultants does not obviate the need for contact with Shipware's customers. First, Shipware is in a different position than AFMS and other third-party consultants named in the complaint. While those consultants claim they have been severely harmed by the policies, Shipware's CEO made statements to the press saying it is "busier than ever" and that "revenue has increased as the company writes more business." UPS Ex. 3, p.132. If UPS can show that even a small, start-up consultant can compete in this market that will be evidence relevant to its defense that there is no substantial adverse effect on competition in the third-party consultant market.

1   Second, Shipware's assertion that it is a small player in this market and thus need not produce its
2   customer information in light of the major players producing their customer information does not negate
3   the facts that the information sought is relevant, non-cumulative and discoverable. *See Compaq*
4   *Computer*, 163 F.R.D. at 339 n.25 ("[Shipware's] information will be illustrative, albeit not dispositive,
5   of industry practice regardless whether [UPS] is able to obtain information from its other competitors.
6   The whole picture may be greater than the sum of its parts, but there can be no picture at all unless the
7   parts are collected one-by-one").
8   In sum, the court finds that UPS has shown a substantial need for the customer communications
9   and identities because they are relevant to the defense of whether its alleged conduct and policies caused
10  a substantial adverse effect on competition in the third-party consultant market, and it cannot otherwise
11  obtain that information without undue burden, if at all.
12  **C.    Protective Order**
13  Shipware asks that a separate protective order be entered for the production of Shipware's
14  documents–even for the production of documents that Shipware has already agreed to produce–that
15  prohibits disclosure to any in-house counsel for the parties and that documents designated AEO be only
16  disclosed to outside litigation counsel.  It argues that it has no information as to whether the three UPS
17  in-house lawyers entitled to review AEO information are competitive decisionmakers for UPS.  UPS
18  argues that the current protective order in place is sufficient because no in-house person at AFMS may
19  see the documents, and that any in-house counsel at UPS or FedEx is precluded from using the
20  information other than for the AFMS litigation.  The only concern Shipware identifies, according to
21  UPS, is inadvertent disclosure.  UPS argues that there are safeguards in place to remedy that situation in
22  the protective order.
23  A protective order allowing "confidential" or "highly confidential" designations is sufficient to
24  protect a nonparty's trade secrets. *In re McKesson Governmental Entities Average Wholesale Price*
25  *Litig.*, 264 F.R.D. 595, 603 (N.D. Cal. 2009).  Here, there is a protective order in place that was
26  presumably negotiated at arms-length in a litigation between UPS and one of Shipware's direct
27  competitors, AFMS.  AFMS would have the same incentive as Shipware to ensure that no UPS
28  competitive decisionmakers had access to its AEO information.  There is no reason to think that

Shipware's generalized and unsubstantiated assertions of fear of disclosure to alleged competitive decisionmakers are not alleviated by this protective order.

As to inadvertent disclosure, "any concerns regarding inadvertent disclosure of confidential and sensitive material may be addressed by the entry of a protective order. The relatively remote potential for inadvertent disclosure of confidential documents does not justify the withholding of discovery altogether." *Sierra Pac. Indus. v. Am. States Ins. Co.*, 2012 U.S. Dist. LEXIS 4473, *6 (E.D. Cal. 2012). Here, the protective order outlines a protocol to follow in the event of an inadvertent disclosure. UPS Ex. 2, p.107. The court finds that the fear of inadvertent disclosure does not overcome Shipware's duty to respond to the subpoena in full.

Finally, Shipware appears to argue that it is concerned that it will breach its confidentiality agreements with customers if forced to turn over the customer identities, even subject to a protective order. But Shipware did not submit to the court a sample confidentiality agreement, so the court cannot determine if such an agreement would be violated. Typically, such agreements contemplate production of confidential information when ordered by a court. *See Michel v. WM Healthcare Solutions, Inc.,* 2011 U.S. Dist. LEXIS 140177, *4-*5 (S.D. Ohio 2011) (noting that confidentiality agreement made a provision for disclosure pursuant to court order).

**IV.   CONCLUSION**

For good cause shown, the court **GRANTS** UPS's motion to enforce the out of district subpoena. The court **ORDERS** Shipware to comply with all the requests in the subpoena and produce the requested documents, subject to the protective order in place in the AFMS litigation, no later than **August 10, 2012**.

**IT IS SO ORDERED.**

DATED: July 27, 2012

_____
Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court